## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re Merejildo R. Gonzales, and Teresa K. Gonzales, | Case No. 10-14412-j7 |
| Debtors. | |

Michael Griego, as Guardian ad Litem for Abe Sanchez,

       Plaintiff

v.                                                                                                             Adversary No. 10-1163-j7

Merejildo R. Gonzales, and
Teresa K. Gonzales,

       Defendants.

## MEMORANDUM OPINION

       This adversary proceeding came before the Court on May 29, 30 and 31 and June 7, 2012 for a trial on the merits. Pedro G. Rael appeared for the Plaintiff. Jane Rocha de Gandara appeared for the Defendants. After a lengthy briefing schedule requested by the parties, both parties submitted post-trial briefs.[1]

       This case is particularly sad. Teresa Gonzales and Merejildo Gonzales, the Defendants, provided a great deal of care for their father and father in-law, respectively, a man named Abe Sanchez, for a period of approximately seventeen years before Abe was rendered incompetent by dementia[2], an infirmity of age. Several years after being diagnosed with insidious dementia, in or around May 2008, Abe left the Gonzales home to move in with another daughter of his, Karen

---

[1] *See* Plaintiff's Brief in Support of Non-Dischargeability of Debt and to Establish Equitable Lien ("Plaintiff's Brief") – Docket No. 53; Debtor's Response to Plaintiff's Brief in Support of Non-Dischargeability of Debt and to Establish Equitable Lien and Debtor's Brief in Support of Debtors['] Requested Finding of Dischargeability ("Defendants' Brief") – Docket No. 56; and Plaintiff's Reply Brief to Debtor's [sic] Response Brief Regarding Dischargeability of Debt and Equitable issues ("Plaintiff's Reply") – Docket No. 57.

[2] The Latin roots of the word, dementia, are *de* and *mens*, meaning "without" and "mind", respectively

Wigley. In late 2009, Michael Griego, the Plaintiff, was appointed guardian ad litem of Abe Sanchez. Upon Mr. Griego's analysis of Abe's finances, which revealed a great deal of missing monies, Mr. Griego pursued Abe's three children and his son-in-law, Merejildo, for cash settlements. Karen admitted to having taken a substantial sum, and immediately settled. Potential claims against Abe's only son, Louis Sanchez, were abandoned. What is left is this case against Teresa and Merejildo, who filed a Chapter 7 bankruptcy case on August 30, 2010 and received their general discharge on April 18, 2011. Mr. Griego now seeks to have the missing monies declared non-dischargeable under various subsections of 11 U.S.C. § 523(a).[3]

**JURISDICTION AND VENUE**

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and (b). The parties have stipulated that this is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A) and (I). See Amended Pretrial Order, Docket No. 41. Pursuant to Fed.R.Civ.P. 52, made applicable by Fed.R.Bankr.P. 7052, the Court now states its findings of fact and conclusions of law.

**FINDINGS OF FACT**

*Background: Abe Sanchez and His Three Children - Teresa, Karen, and Louis*

Abe Sanchez spent 22 years in the Navy, retired, and then spent 11 years working for the U.S. Postal Service in Albuquerque before retiring for good. His sources of income thereafter were Navy retirement benefits and federal social security income. Prior to his retirement from the Navy, Abe's wife and the mother of his three children – Louis, Karen, and Teresa, who were all born about a year apart – committed suicide amidst serious family troubles. Those family troubles led Abe to be more generous to

---

[3] Hereinafter, any references to "section[s]" or "§[§]" refer to the indicated section(s) of Title 11 of the United States Code, *i.e.,* the Bankruptcy Code.

Karen than he was to his other two children. Karen and her children frequently requested monies from Abe, which he readily gave them. They sometimes took his money without asking. Abe bought a number of cars for Karen and her family. When Teresa would confront Abe about his profligacy towards Karen, he would tell Teresa to mind her own business. The generosity is noteworthy for, by all accounts, Abe was notoriously parsimonious.

Abe was also a fiercely independent and domineering man – he was described as a "my way or the highway" type of guy – that is, he was largely non-negotiating. He moved in with his daughter and son-in-law, Teresa and Merejildo Gonzales, in 1991. Merejildo, who has worked in construction since 1976 and as a general contractor since 1996, borrowed approximately $22,000 from Abe in 1992 in order to build Abe a small home on Teresa's and Merejildo's residential property (the "Meadow Lake Property"), which everyone in the family referred to as Abe's "Wigwam". The Wigwam was built with its own garage, bathroom, heating system, and other amenities. Teresa did not enter the Wigwam, except upon Abe's request. Despite the facts that Teresa and Merejildo were experiencing financial difficulties at this time[4] and that the Wigwam was for Abe's sole use, Teresa and Merejildo paid these monies back to Abe. Abe did not pay for utilities.

Providing Abe with the Wigwam was not an exception to Teresa's and Merejildo's generosity toward Abe. They readily provided Abe with a great deal of support. Abe was fed dinner most days that he lived with them, free of charge. Teresa in particular spent a great deal of time with Abe, assisting him in various ways when he so requested; they frequently played card games, too. Abe paid only for food that he purchased and kept in his Wigwam, knickknacks

---

[4] Teresa filed a previous bankruptcy case around this period and did not ask Abe to help settle her debts.

that he bought from the Publishers Clearing House company[5], transportation expenses, and monies that he gave to Karen and her family (but not to Louis[6] or Teresa's and Merejildo's family). Things continued in this vein for approximately fourteen years.

*Abe's Condition Begins to Deteriorate and He Draws Down His Bank Accounts*

In November 2005, Abe began to more severely experience the effects of old age. His memory weakened, and he basically forgot how to play cribbage, one of his favorite games. He would trip more frequently than before, as his eyesight began to fail. This led Teresa to take Abe to a Veterans Affairs ("V.A.") medical center, where Dr. John Adair diagnosed Abe as having symptoms "most consistent with degenerative dementia (ie AD)." *See* Exhibit 7, the "2005 Report". Abe was also diagnosed with macular degeneration around that time. It was clear that Abe was going to need an increasing amount of medical care. The 2005 Report provides a differential diagnosis of Abe, stating that he has "insidious[7] onset of language and memory dysfunction, now with evidence of impact on functional abilities." The "Mental Status Summary" notes that Abe had "decreased attention" and reduced "category fluency" and that his "new learning" abilities were three standard deviations below the mean. The "History" section stated:

> This is a 78 year-old man referred for evaluation of "memory loss". History is obtained from patient and daughter [Defendant Teresa Gonzales] (with whom he's lived for 10+ years). Per both, some problems started insidiously about 9-10 years ago […] course has been progressive deterioration with particular problems in past 3-6 months. […]. [his daughter, Teresa Gonzales] needed to take over finances in past year b/c "mail order people took advantage of him".

---

[5] The Publishers Clearing House is a direct-marketing firm that offers discounted merchandise to consumers and runs a large number of sweepstakes contests.
[6] Abe did buy Louis's share of a father-and-kids trip to Australia. Although he also paid for Karen, Teresa paid her own way.
[7] "Insidious" means, *inter alia*, "developing so gradually as to be well established before becoming apparent" and "acting by imperceptible degrees: having a gradual, cumulative, and usually hidden effect." Webster's Third New International Dictionary: Unabridged 1169 (1981). The Court takes this to mean that Abe's dementia slowly got worse over several years, an extrapolation supported by Abe's children's testimony.

-4-

*See* the 2005 Report (quotations in original).

Ever frugal, Abe then made the ultimately fateful decision to draw down his bank accounts to below one-hundred thousand dollars and to cash his certificates of deposit. At the end of 2005, Abe had on deposit with Wells Fargo approximately $180,000.[8] It was Abe's belief that, since the Department of Veterans Affairs is a non-for-profit government entity whose eponymous business is to serve veterans' needs, he would not (and should not) have to make medical "co-pays" if he had less than one-hundred thousand dollars in his bank accounts and certificates of deposit.[9] It was on that basis that he made a decision that ultimately brought the parties before the Court: to draw down his bank accounts, cash in his certificates of deposit, and start keeping a large percentage of his wealth in cash in lockboxes in his Wigwam. Abe was the mastermind of this scheme. Abe was domineering, and insisted on his plan. His children complied.

Upon Abe's diagnosis and knowing of his plan to draw down his bank accounts, Teresa contacted her siblings, Louis and Karen, for the purpose of having a family meeting in order to discuss how to properly care for their father. Responsibilities were divided: Teresa would make sure Abe's medical needs were met, and Karen would help Abe maintain his finances. Louis would be available as needed. This meeting was held around the end of 2005 or the beginning of 2006. Teresa wanted to have these meetings while Abe was still competent, so that Abe could be the one who "called the shots." It was probably a wise decision to hold that meeting so soon, as Abe steadily deteriorated as time went on, getting in a car accident in 2006 and being unable to recognize Louis by late 2008. In any case, Abe's children convinced him, at least initially, that keeping large amounts of cash in lockboxes at home was a foolish idea and that he should

---

[8] Abe's complete bank records were not proffered into evidence, and the Court therefore uses approximate figures.
[9] The Court does not recite this finding for the truth of the matter asserted (that no co-pays are required at that wealth level), but for the purpose of explaining Abe's subsequent actions.

-5-

instead obtain a safe deposit box. Abe did so. A safe deposit box was opened at Wells Fargo Bank on January 20, 2006. Both Abe and Teresa were listed as the customers for that safe deposit box, and they each had one of the two existing keys. *See* Exhibit 16.

In January 2006, Abe, his children, Teresa and Karen and Louis, and his son-in-law, Merejildo, began to draw down Abe's accounts in what became family visits to the bank. On or about January 11, 2006, Abe cashed out two certificates of deposit for $40,268.65 and $36,996.73. *See* Exhibit 6. The proceeds of the two certificates of deposit were taken in cash and all or most of the cash was placed in the safe deposit box. Over the next five months, Abe wrote seven checks from his bank accounts, in the aggregate amount of $37,000, to Merejildo, Teresa, Karen and Louis, in order to draw his bank accounts further. *See id.* One of these checks was signed by Teresa; the rest were signed by Abe. Each check was converted to cash. Abe directed that each check be less than $10,000, to avoid what he perceived to be bank regulatory reporting requirements. Abe was still fully in control of his affairs at this time, though he was recalcitrant and would often request favors, even ones involving minimum effort, of Teresa. Both Teresa and Karen's names were already listed on Abe's bank accounts at that time.

There was also some discussion about Abe granting Teresa a power of attorney. Teresa testified that Abe told her he had given her a power of attorney, but that she never saw a power of attorney, did not believe that she had a power of attorney for Abe, and is not aware of what language would be included in a power of attorney. No power of attorney was offered into evidence at trial.

Four visits were made to the safe deposit box in 2006, in which Abe or Teresa placed cash withdrawn from his bank accounts or from redemption of the certificates of deposit. The timing of the first two visits to the safe deposit box corresponds relatively closely with the series

-6-

of seven checks drawn on Abe's bank accounts and the cashing of the certificates of deposit. The safe deposit box was opened and first visited approximately a week after the cashing of the certificates and the first two checks. The second visit to the safe deposit box came on the same day that the fourth, fifth, and sixth checks were written. A few other checks were drawn on Abe's bank accounts, and a few more visits to the safe deposit box occurred in August and December 2006. The Court finds that the timing of the visits to the safe deposit box and the withdrawal of funds from Abe's bank accounts corroborates the undisputed testimony of all parties that there was a scheme to draw down Abe's bank accounts and redeem his certificates of deposit, and to deposit cash into a safe deposit box. *See, generally,* Exhibits 6 and 16.[10] Teresa rather than Abe signed the record entries to the safe deposit box because Abe was having trouble seeing. At some point in 2006, Teresa gave her key to the safe deposit box to her brother Louis, in order to weaken any present and future claims by Karen that Teresa had stolen or would steal Abe's money.[11] Thereafter, Teresa would call Louis when she needed access to the safe deposit box.

Additional monies, the exact amount of which are unknown but appear to have been substantial, were also kept by Abe in lockboxes in his Wigwam. Historically, Abe always kept a lot of cash in his Wigwam. The ultimate location of the monies kept in the lockboxes is unknown, but that comes later in the sequence of events that transpired.

---

[10] In perusing Exhibit 6, which is titled as "Questionable Withdrawals/Deposits 2002-2007" (though the entries actually span from 2005 to 2009), the Court takes note that Karen signed checks made out to her son totaling in the thousands of dollars in 2009. See, also, Exhibit 9.

[11] There is currently a great deal of animosity between Teresa and Karen. Their relationship appears to have been rocky for a long time, but to have worsened considerably since Abe began his decline and to have totally broken down once Abe moved in with Karen. Prior to Abe's downfall, relations between the two sisters were good enough that Karen would occasionally stay with Teresa and Merejildo in their home.

-7-

### *Merejildo Borrows Money to Build Abe a New Wigwam*

In 2007, Merejildo used his construction skills to build his family and Abe a new house (the "Horseshoe Trail Property"). Given Abe's deteriorating eyesight, Teresa and Merejildo planned the new house such that Abe would have his own studio apartment and garage, his new Wigwam, which would be attached to another garage. This allowed Abe easier access to the main house and lessened the risk of potentially dangerous falls for Abe. When Merejildo was explaining this to Abe and showing him the plans for the Horseshoe Trail Property, Merejildo mentioned that he did not know whether he would be able to afford all of the construction costs, even though such costs were greatly reduced by Merejildo performing much of the work himself.

At that point, Abe offered Merejildo a loan, an offer which Merejildo readily accepted. Merejildo took Abe to the bank, after which Abe was able to provide Merejildo with a number of cashier's checks in amounts of $9,000. The checks were in such denominations because, 1) Merejildo wanted to ration the money in order to check against overspending; and 2) Merejildo and Abe believed that any checks over $10,000 would have to be reported to federal banking regulatory agencies.

It is unclear exactly how much money Merejildo borrowed from Abe under this premise, although testimony indicated that Merejildo was given six cashier's checks, for a total amount of $54,000. No copies of the cashier's checks were proffered into evidence. In 2007, Abe made two withdrawals from his bank accounts in the amount of $65,000 each, one in March and one in August.[12] *See* Exhibit 6. Karen Wigley admits to receiving the proceeds from at least one of these withdrawals. It appears that the monies Abe loaned Merejildo were proceeds of the other $65,000, although that is not entirely clear.

---

[12]These two withdrawals were in addition to the checks written for the purpose of placing cash in the safe deposit box.

-8-

The Court finds Merejildo's testimony that he borrowed the $54,000 from Abe with the intent to repay the loan credible. This arrangement was consistent with the Defendants' reimbursement of Abe for the loan he made them in the early 1990s for the construction of his Wigwam. Although the document was lost, Merejildo executed an "IOU" to Abe for these borrowed monies, payable upon the sale of the Meadow Lake property. A purchaser for the Meadow Lake property had been found at that time. Unfortunately, the Meadow Lake property caught fire shortly thereafter, rendering a sale impossible. No credible evidence was presented that would support a finding that Merejildo wrongfully obtained the funds (whether they totaled $54,000 or $65,000) from Abe. Based on the evidence presented, the Court finds that Merejildo borrowed the funds from his father-in-law to be used in connection with the construction of the Horseshoe Trail Property. Abe moved into his studio apartment in the Horseshoe Trail Property with the rest of the family at some point during the last few months of 2007.

*Abe's Condition Becomes Dire and He Moves Out*

After Abe moved into the Horseshoe Trail Property, Abe's condition noticeably deteriorated. He had both "good" and "bad" days. Abe was still feisty, however, and at some point demanded that all of the cash in his safe deposit box be handed over to him. Louis and Teresa visited the safe deposit box together in January 2008 (*see* Exhibit 16) and removed all of the cash, save a single $100 bill. The cash removed from the deposit box was substantial. Louis counted it at the time and testified that it was in excess of $100,000. Louis and Teresa took the cash, put it in a brown paper sack, and delivered the sack containing the cash to Abe in his studio apartment. Abe then placed the cash in lockboxes he stored in his apartment. Louis and Teresa left a single $100 bill in the safe deposit box because they believed it was necessary to leave

something in the box for it "to remain active." Teresa and Louis delivered the cash to Abe without knowing that Abe had decided to move out of the Horseshoe Trail Property.

A few short months later, Abe informed Teresa, after a visit with Karen, that he wanted to move in with Karen. Teresa was furious and exhorted Abe to stay. However, Abe moved out in May 2008. Abe's move caused a great deal of anguish to Teresa, culminating in at least one brief physical altercation between Karen's and Teresa's daughters and exchanges of harsh words between Karen and Teresa. Teresa banned Karen from the Horseshoe Trail Property around the time Abe moved out. Karen had most of Abe's possessions placed into storage by professional movers, although one of Teresa's daughters testified that she saw Karen place Abe's lockboxes into her personal vehicle. Before 2008 ended, Abe's condition had deteriorated to the point that he could no longer regularly identify his son, Louis, when Louis was visiting. After Abe moved to Karen's house, Teresa and Louis visited the safe deposit box two more times, once in February 2009 and once in March 2009. Neither Louis nor Teresa could recall the purpose of these visits. Louis's testimony was particularly credible. He testified that he honestly could not remember why he and Teresa visited the safe deposit box the last two times, though he acknowledged that there must have been some reason. The Court finds that neither Teresa nor Louis took any money from the safe deposit box in February or March 2009.

*A Guardian ad Litem is Appointed and Money Has Gone Missing*

In June 2009, Karen filed a "Petition for Appointment of Conservator and Guardian" in the Thirteenth Judicial District of the State of New Mexico, proposing that she be named as guardian and Michael Griego, the Plaintiff here, as guardian ad litem of Abe Sanchez. *See* Exhibit A. The Petition also suggested that Steven Clark be appointed visitor. Steven Clark was appointed visitor and visited the homes of both Karen and Teresa in July and August 2009,

-10-

respectively. At that point, Teresa had filed a counter-petition to serve as guardian. Mr. Clark declared both Karen and Teresa adequate to serve as guardian and conservator of Abe and his estate. *See* Exhibits 17 and 18. On or about July 23, 2009, Dr. Adair declared Abe "decisionally impaired on a permanent basis." Exhibit 8. Michael Griego was appointed guardian ad litem on or about August 24, 2009. Eventually, Karen was appointed guardian of Abe on or around January 6, 2011.

When the Plaintiff, Michael Griego, became guardian ad litem for Abe, Mr. Griego discovered that Abe had only about $7,500 left in his bank accounts. Four years prior, Abe's account balances were around $180,000. The two certificates of deposit totaling more than $75,000 had also been cashed. Noticing this sharp drop in bank account balances, Mr. Griego investigated the situation. The safe deposit box was visited a final time in October 2009, *see* Exhibit 16, whereupon Mr. Griego observed the single $100 bill that Teresa and Louis had left in it. The cash totaling over $100,000 that had once been in the safe deposit box was missing. Mr. Griego talked to all three siblings. He doubted Teresa's story, finding it incredible that she would allow Abe, a man with degenerative dementia, to liquidate his bank accounts and certificates of deposit and place so much cash in lockboxes in his place of residence. Mr. Griego was further put off by Teresa's attitude towards Karen, as in an interview she referred to her sister as a "murderer" and a "leech." Mr. Griego also believed that Karen had probably wrongfully taken substantially more than $75,000.

Mr. Griego sent strongly-worded letters to Abe's children, inviting them to put their best settlement forward in order to resolve the problem of the missing monies. Karen came forward (through her attorney) and offered to settle. Because she was so ready to settle and because her attorney was very aggressive, Mr. Griego decided not to investigate Karen nearly as thoroughly

as Teresa, who denied ever taking money from Abe.  Mr. Griego settled with Karen for $59,000 and a promise on her part that she would continue to care for Abe.

There is a great deal of money that remains missing.  However, the evidence does not establish that Teresa or Merejildo took it.  There is no direct evidence that Teresa or Merejildo wrongly took any of the missing money. Further, the circumstantial evidence does not support such a finding.  Abe's daughter, Karen, admitted to wrongfully taking substantial money from Abe.  Karen's children likewise pilfered some of his money.  The evidence does not establish whether the balance of the missing money was taken while Abe resided with Teresa and Merejildo, during Abe's move to Karen's house when several individuals had the opportunity to take the money, or at some time later.  The Court finds credible the testimony of Teresa and Louis that they took all of the funds from the safe deposit box and gave them to Abe for safekeeping in his lockboxes at a time when Teresa believed Abe would continue to reside at the Horseshoe Trail Property.  Teresa and Louis's two subsequent visits to the safe deposit box remain unexplained.  But the totality of the evidence presented fails to support an inference that Teresa took Abe's money for herself.

There is no evidence of any unusual accumulation of assets or funds by Teresa or Merejildo or of any expenditure by them that could not be made from their own assets.  Teresa and Merejildo took good care of Abe for many years, and supported him financially even though he did not actually need financial assistance.  The evidence does not support a finding that Teresa or Merejildo took any of Abe's money to repay themselves for the assistance they gave Abe over the years.

Although Teresa kept no accounting of the amounts of cash placed in the safe deposit box, or the amount of cash taken from the box and returned to Abe to be placed in his lockboxes,

-12-

the Court finds credible the testimony of Teresa, Merejildo, and Louis that they never wrongfully took any of Abe's money. The only debt Teresa and Merejildo owed to Abe at the time they filed their Chapter 7 bankruptcy case is the $54,000 Abe loaned Merejildo for the construction of Abe's studio apartment at the Horseshoe Trail Property.

**DISCUSSION**

The Plaintiff, as guardian *ad litem* of Abe Sanchez, asserts that the Defendants owe debts that are non-dischargeable under 11 U.S.C §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) relating to the missing money and the money used to construct the Horseshoe Trail Property.[13] The Court disagrees.

    A. <u>There is No Non-Dischargeable Debt Resulting from the Missing Money</u>.

The Court's findings of fact establish that neither Teresa nor Merejildo wrongfully took any of Abe's money. The necessary result of this finding is that Plaintiff's claims for fraud, embezzlement, larceny, and willful and malicious injury premised on Teresa and Merejildo's handling of Abe's money fail. Claims for fraud under § 523(a)(2)(A), embezzlement or larceny under § 523(a)(4), and for willful and malicious injury under § 523(a)(6) all require that the debtor acted with bad or fraudulent intent.[14] No such fraudulent or intentionally bad conduct occurred.

---

[13] Plaintiff may have abandoned his fraud claims under § 523(a)(2)(A). A pretrial order "controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d), made applicable by Fed.R.Bankr.P. 7016. Although the Amended Pretrial Order (Docket No. 41) includes a claim under § 523(a)(2)(A), Plaintiff's Reply concedes that Plaintiff has abandoned this claim. *See* Plaintiff's Reply, p. 2 ("Debtors argue that there was no evidence of fraudulent representations made to Abe Sanchez. This issue was not argued in Plaintiff's brief, and was therefore abandoned."). The Court will nevertheless consider Plaintiff's claims under § 523(a)(2)(A) since such claims were included in the Pretrial Order.

[14] A claim under § 523(a)(2)(A) requires that the debtor acted "with intent to deceive." *Fowler Bros v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996)(identifying the elements of a claim under § 523(a)(2)(A)). A claim under § 523(a)(6) requires that the debtor acted both willfully (intending the act and intending the harm) and maliciously (acting without just cause or excuse). *See Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998)(holding that nondischargeability under § 523(a)(6) "takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury."); *America First Credit Union v. Gagle (In re Gagle),* 230 B.R. 174, 181 (Bankr.D.Utah 1999)("In order for an act to be willful and malicious it must be a deliberate act

-13-

*Defalcation and Fiduciary Capacity Under § 523(a)(4)*

Pursuant to § 523(a)(4), debts "for fraud or defalcation while acting in a fiduciary capacity" are non-dischargeable. 11 U.S.C. § 523(a)(4). Unlike embezzlement and larceny, which include a fraudulent intent requirement, defalcation under § 523(a)(4) merely requires a failure to account for entrusted property, whether such failure is the result of intentional, willful, reckless, or negligent behavior. *See Antlers Roof-Truss & Builders Supply v. Storie (In re Storie),* 216 B.R. 283, 288 (10th Cir. BAP 1997)("'defalcation' under section 523(a)(4) is a fiduciary-debtors' failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, willful, reckless, or negligent.").[15] However, a threshold requirement for defalcation under § 523(a)(4) is fiduciary capacity. *Foxworth Gailbraith Lumber Co., Inc. v. Manelos (In re Manelos),* 337 B.R. 409, 412-13 (Bankr. D.N.M. 2006)(stating that the existence of a fiduciary relationship is a "threshold issue to the determination of

---

(willful) that is performed without justification or excuse (malicious)."). Embezzlement and larceny under § 523(a)(4) both require that the debtor act with fraudulent intent. *Hill v. Putvin (In re Putvin),* 332 B.R. 619, 627 (10th Cir. BAP 2005)("Under 523(a)(4) embezzlement will have occurred when there is a 'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, *and it requires fraud in fact, involving moral turpitude, or intentional wrong*, rather than implied or constructive fraud.'")(emphasis added)(additional internal quotation marks and citations omitted)); *Hernandez v. Dorado (In re Dorado),* 400 B.R. 304, 309-310 (Bankr. D.N.M. 2008)("'larceny is defined as the 'fraudulent and wrongful taking and carrying away of property of another with intent to convert it to the taker's use and with intent to permanently deprive the owner of such property.'")(quoting *Bryant v. Tilley (In re Tilley),* 286 B.R. 782, 789 (Bankr.D.Colo. 2002)(additional internal quotation marks and citations omitted)); *Sullivan v. Clayton (In re Clayton),* 198 B.R. 878, 885 (Bankr.E.D.Pa. 1996)("Essential to both larceny and embezzlement is the element of fraudulent intent.")(citing *In re Graham,* 194 B.R. 369, 374 (Bankr.E.D.Pa. 1996) and *In re Spector,* 133 B.R. 733, 741 (Bankr.E.D.Pa. 1991)).

[15]*See also, Global Express Money Orders, Inc. v. Davis (In re Davis),* 262 B.R. 673, 684 (Bankr.E.D.Va. 2001)(stating that "[d]efalcation is defined as 'the slightest misconduct, and it need not be intentional conduct; negligence or ignorance may be defalcation.'")(quoting *Bailey v. Sonnier (In re Sonnier),* 157 B.R 976, 984 (E.D.La. 1993), *quoting Morales v. Codias (In re Codias),* 78 B.R. 344, 346 (Bankr.S.D.Fla. 1987)(citation omitted))(remaining citations omitted); *Hawks Holdings, LLC v. Kalinowski (In re Kalinowski),* 449 B.R. 797, 814 (Bankr. D.N.M. 2011), *aff'd,* __ B.R. __, 2012 WL 5505078 (10th Cir. BAP 2012)(noting that "[s]pecific intent to harm the creditor, though sufficient to establish a defalcation under 11 U.S.C. § 523(a)(4), is not required.")(citations omitted).

-14-

dischargeability under 11 U.S.C. § 523(a)(4).")(citing *Storie,* 216 B.R. at 286)(remaining citation omitted)).[16]

The fiduciary capacity contemplated by § 523(a)(4) is extremely narrow; it only arises when there is an express or technical trust, and must exist prior to and not a result of the wrongdoing. *See Neal,* 324 B.R. at 370 ("The Tenth Circuit has taken a very narrow view of the concept of fiduciary duty under this section."); *Allen v. Romero (In re Romero),* 535 F.2d 618, 621 (10th Cir. 1976)(stating that "[t]he exception under §17(a)(4) [the predecessor under the former Bankruptcy Act to §523(a)(4)] applies only to technical trusts and not those which the law implies from a contract.")(citation omitted). *See also, Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 154, 79 L.Ed. 393 (1934)(noting that the debtor "must have been a trustee before the wrong and without reference thereto."). An express trust requires the intent to create a trust, a clearly defined trust *res,* and specific trust duties.[17] A technical trust can arise as a result of a state statute that imposes specific trust duties with respect to a specific trust *res.*[18]

Plaintiff argues that Teresa acted in a fiduciary capacity based on her belief that Abe had granted her his power of attorney. Plaintiff also asserts that Teresa undertook duties as a result of the family meeting that were "tantamount to those of a fiduciary." Plaintiff's Brief, p. 17.[19] These circumstances are insufficient to establish a technical or express trust and consequent fiduciary capacity for purpose of § 523(a)(4). There was no evidence that Teresa actually held a

---

[16]*See also Duncan v. Neal (In re Neal),* 324 B.R. 365, 371 (Bankr.W.D.Okla. 2005), *aff'd,* 342 B.R. 384 (10th Cir. BAP 2006)(stressing that the "failure to account" must be based on the breach of a fiduciary duty).

[17]*See, Tulsa Spine Hospital, LLC v. Tucker (In re Tucker),* 346 B.R. 844, 850 (Bankr.E.D.Okla. 2006)("'The elements of an express trust are the intent to create a trust, a clearly defined trust res, and specific trust duties.'")(quoting *In re Stefanoff,* 97 B.R. 607 (Bankr.N.D.Okla. 1989)).

[18]*See Neal,* 324 B.R. at 370 (explaining that a technical trust is a trust imposed by statute); *Cundy v. Woods (In re Woods),* 284 B.R. 282, 288 (D.Colo. 2001)("A technical trust may arise as a result of defined obligations imposed upon the debtor by a state or federal statute.")(citing *Romero,* 535 F.2d at 622).

[19]Plaintiff relies, in part, on this Court's decision in *Kalinowski,* wherein the Court found that the defendant was the *de facto* manager of the limited liability company that had a fiduciary duty pursuant to a state statute and therefore acted in a fiduciary capacity for purposes of § 523(a)(4). 449 B.R. at 812-813. *Kalinowski* is inapplicable to this adversary proceeding because there is no state statute at issue here that would give rise to a technical trust under § 523(a)(4).

general power of attorney for Abe or acted under a power of attorney. Nor did the family meeting evidence the intent to create a trust with specific trust duties and clearly defined trust property. A generalized duty of confidence, trust, loyalty or good faith is insufficient for purposes of establishing a fiduciary capacity within the meaning of § 523(a)(4). *See Young,* 91 F.3d at 1372 (stating that "[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power is insufficient to establish a fiduciary relationship for purposes of dischargeability.")(internal citations omitted). Moreover, at the family meeting, it was Karen, not Teresa, who was charged with maintaining Abe's finances. The fact that Teresa had access to the safe deposit box and the money is now missing is insufficient to establish a non-dischargeable debt under § 523(a)(4). The evidence failed to establish the existence of an express or technical trust.

B.   The Defendant's Obligation to Repay the $54,000 Loan is Dischargeable

The only remaining debt Teresa and Merejildo owe Abe is an obligation to repay the $54,000 Merejildo borrowed from Abe to build a studio apartment as Abe's living quarters. This debt is dischargeable.

The Court's findings of fact establish that Merejildo obtained a loan from Abe to construct the Horseshoe Trail Property and that at the time Merejildo borrowed the money he had a present intent to repay the loan. Because Merejildo did not wrongfully obtain the borrowed funds, Plaintiff's claims for fraud, embezzlement, larceny, and willful and malicious injury fail. To establish a claim for fraud under § 523(a)(2)(A) the plaintiff must demonstrate that the debtor made a false representation with the intent to deceive the creditor.[20] Merejildo did not make a false representation to Abe, nor did he

---

[20]*See Young,* 91 F.3d at 1373 (stating that the required elements under § 523(a)(2)(A) are: "1) [t]he debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on

intend to deceive him in connection with the borrowed funds. Merejildo built the studio apartment for Abe with the funds Merejildo borrowed, and Abe moved into it. Merejildo had previously borrowed money from Abe in order to build him living quarters separate from the rest of Merejildo's family and had repaid that loan. Considered in the light of the history between Merejildo and Abe, the fact that Merejildo actually built a studio apartment with the borrowed funds, and Merejildo's credible testimony that he intended to repay the loan, the Court is convinced that Merejildo did not intend to deceive Abe. Therefore, Plaintiff's claim under § 523(a)(2)(A) with respect to the borrowed funds fails.

Similarly, claims for embezzlement or larceny under § 523(a)(4) require a showing of fraudulent appropriation of funds[21], and a claim for willful and malicious injury under § 523(a)(6) requires a plaintiff to demonstrate that the debtor intended to harm the plaintiff.[22] Because the Court finds that Merejildo did not act fraudulently and did not intend to harm Abe by borrowing the funds to construct the Horseshoe Trail Property, Plaintiff's claims for embezzlement, larceny, and willful and malicious injury necessarily fail. Further, having determined that no willful or malicious injury occurred, Plaintiff's request for punitive damages is denied. Finally, a claim for non-dischargeability of debt based on defalcation under § 523(a)(4) first requires the existence

---

the representation; the creditor's reliance was [justifiable]; and the debtor's representation caused the creditor to sustain a loss.")); *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d. 351 (1995) (changing the standard of reliance under § 523(a)(2)(A) from "reasonable" to "justifiable."); *In re Riebesell,* 586 F.3d 782, 789 (10th Cir.2009)(same).

[21]"[E]mbezzlement is defined under federal common law as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *Cabrera v. Larranaga (In re Larranaga),* 2010 WL 3521732 at *6 (Bankr. D.N.M. Sept. 3, 2010)(quoting *In re Wallace,* 840 F.2d 762, 765 (10th Cir. 1998)(citation to quoted case omitted). "[L]arceny is defined as the fraudulent and wrongful taking and carrying away of property of another with intent to convert it to the taker's use . . . " *Dorado,* 400 B.R. at 309 (internal quotation marks and citation omitted).

[22]For purposes of non-dischargeability under § 523(a)(6), the "willful" and "malicious" prongs are analyzed separately; both are required. C*AGO, Inc. v. Slade (In re Slade),* 471 B.R. 626, 650 (Bankr. D.N.M. 2012). *See also, Geiger,* 523 U.S. at 61 (stating that "nondischargeability takes a deliberate or intentional *injury* . . .").

-17-

of a fiduciary relationship.[23]  A loan does not automatically place the borrower in a fiduciary capacity with respect to the lender.  *See McEntee v. Malycky (In re Malycky),* 2011 WL 6740753, *5 (Bankr.E.D.N.Y.  Dec.22, 2011)("A fiduciary relationship will not arise merely as a result of a lender/borrower relationship, or the failure of a borrower to repay a loan.")(citing *In re Hanson,* 432 B.R. 758, 780 (Bankr.N.D.Ill. 2010)).  There is no evidence that the borrowed funds were given to Merejildo in trust pursuant to an express trust; nor has Plaintiff directed the Court to any statute that could give rise to a technical trust within the meaning of § 523(a)(4).[24]  The Court, therefore, finds that the Defendants were not acting in a fiduciary capacity with respect to the borrowed funds.

*Equitable Remedies are Not Warranted*

Plaintiff requests the Court to impose an equitable lien or constructive trust on the Defendants' residence in favor of Abe as a result of the Defendants' use of the $54,000 to construct the Horseshoe Trail Property.[25]  The consideration of equitable liens or constructive trusts requires application of state law.[26]  Under New Mexico law, when there is no agreement that grants a party a lien or mortgage on real property to secure a debt, an equitable lien does not arise simply by virtue of the fact that a party provides the funds that are used to construct a

---

[23]*See Manelos,* 337 B.R. at 412-413 (whether there is a fiduciary relationship is a threshold issue under § 523(a)(4)).

[24]Fiduciary capacity under § 523(a)(4) is limited to express and technical trusts. *See Young,* 91 F.3d at 1371 ("an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4).")(citing *Romero,* 535 F.2d at 621)(remaining citations omitted).  A technical trust is a trust imposed by statute.  *See Neal,* 324 B.R. at 370 ("Trusts imposed by state statutes are technical trusts, which may lead to the existence of a fiduciary relationship.")

[25]An equitable lien against real property creates a lien that may be enforced against the property itself in order to realize an equitable interest in the property. *Darr v. Muratore,* 143 B.R. 973, 976 (D.R.I. 1992)(citation omitted).  Enforcement of a constructive trust results in "an in personam obligation on one party to convey real estate to the other party in order to prevent unjust enrichment." *Id.* (citation omitted).  *See also In re Pardee,* 433 B.R. 377, 387 (Bankr.N.D.Okla. 2010)(observing that "[a]constructive trust and an equitable lien are alternate –and distinct— remedies" and explaining further that "[a] constructive trust imposes an equitable duty to convey specific property to another[ ]" while "[a]n equitable lien . . . gives them a security interest that attaches to specific property.")(citation omitted).

[26]*Cf.  In re K-Ram, Inc.,* 451 B.R. 154, 171 (Bankr. D.N.M. 2011)("State law governs constructive trust issues, and the person asserting the trust has the burden to establish the trust requirements.")(citing *Hill v. Kinzler (In re Foster),* 275 F.3d 924, 926 (10th Cir. 2001)).

Case 10-01163-j    Doc 59    Filed 11/21/12    Entered 11/21/12 11:34:51 Page 18 of 20

building on the property. *See Van Sickle v. Keck,* 42 N.M. 450, 454, 81 P.2d 707, 710 (1938)(stating that "[a]n equitable lien . . . did not arise from the fact that plaintiff furnished the money to by the lot . . . and erect the building thereon."). For the imposition of a constructive trust, the requesting party must generally demonstrate "fraud, duress, overreaching or similar unconscionable conduct," although an abuse of a confidential relation and unjust enrichment may also serve as sufficient grounds to support the imposition of a constructive trust. *Garcia v. Marquez,* 101 N.M. 427, 428, 684 P.2d 513, 514 (1984)(citations omitted).

The Court has already determined that Merejildo borrowed the money from Abe to build the Horseshoe Trail Property with the intent to repay the loan. There was no agreement, written or otherwise, granting Abe a mortgage or lien against the Horseshoe Trail Property. Merejildo used a portion of the money to construct a studio apartment with garage on the Horseshoe Trail Property for Abe's use and benefit, and in fact, Abe did reside there for a period of time. Abe voluntarily chose to leave the Horseshoe Trail Property and move in with his other daughter, Karen. As discussed above, Merejildo did not obtain the money from Abe through fraud. Nor is there any evidence of undue influence or a fiduciary relationship that would justify the imposition of a constructive trust or equitable lien against the Defendants' property. Finally, because the Court believes Merejildo's testimony that he intended to repay the loan, and because Abe voluntarily chose to leave the Horseshoe Trail Property, the Court finds that the Defendants were not unjustly enriched.[27]

---

[27]Because the Court's findings establish that Plaintiff is not entitled to a constructive trust or equitable lien, it is not necessary for the Court to determine whether such equitable remedies can serve to deprive a debtor of the full benefit of a discharge.

-19-

**CONCLUSION**

Plaintiff's claims on all counts are denied. A separate judgment will be entered consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: November 21, 2012

COPY TO:

| | |
|---|---|
| Pedro G. Rael | Jane Rocha de Gandara |
| Attorney for Plaintiff | Attorney for Defendants |
| PO Box 460 | 505 Main St. SW |
| Los Lunas, NM 87031-0460 | Los Lunas, NM 87031-4079 |